UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ X
                                   :

UNITED STATES OF AMERICA,          :

                                   :

             -against-        :

                                   :

MUTAK Y. VAID, et al.,             :

                        Defendants. :

------------------------------------------------------------ X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: _9/5/2017___

16 Cr. 763 (LGS)

**OPINION AND ORDER**

LORNA G. SCHOFIELD, District Judge:

Defendants Mustak Y. Vaid, Paul J. Mathieu, Ewald J. Antoine, Marina Burman, Asher Oleg Kataev, Alla Tsirlin, Hatem Behiry, Lina Zhitnik, Eduard Miselevich and Ivan Voychak are charged with conspiring to commit health care fraud. This Opinion addresses pretrial motions: (1) to dismiss the operative indictment as to Vaid; (2) to sever Count Six as to Mathieu; (3) to suppress post-arrest videotaped statements of Mathieu, Antoine and Zhitnik; (4) for a bill of particulars, (5) for production of *Brady* and *Giglio* material and (6) disclosure of Rule 404(b) evidence.[1] For the following reasons, the motions for the bill of particulars and production of *Brady* material are granted in part and denied in part, and the other motions are denied.

## I.   BACKGROUND

### A.   The Alleged Scheme

The Second Superseding Indictment is the operative indictment and is referred to in this Opinion as the "Indictment." It charges that, beginning in 2007 and continuing through at least 2013, Defendants participated in a conspiracy to defraud the Medicare Program ("Medicare"), the New York State Medicaid Program ("Medicaid") and other insurance providers. The scheme

---

[1] Defendant Burman also moves to suppress evidence recovered pursuant to a search warrant. That motion is not addressed in this Opinion and will be resolved by a separate order.

allegedly involved eight medical clinics in Brooklyn, New York (the "Clinics") owned and operated by a co-conspirator (the "True Owner").[2]  The Indictment alleges that Defendants caused the Clinics to submit fraudulent claims to Medicare, Medicaid and other insurance providers for unnecessary medical services or services that were in fact not provided.  These services were purportedly provided to individuals who were insured by Medicare, Medicaid or both, and who some Defendants and co-conspirators had recruited with cash payments (the "Paid Patients").

The Indictment further charges that Defendants and their co-conspirators provided the Paid Patients prescriptions and referrals for medically unnecessary medications, transportation services or durable medical equipment ("DME"), such as adult diaper kits.  This allowed third-party providers to bill Medicare, Medicaid and other insurance providers for services, medications or equipment that were medically unnecessary or in fact not provided.

### B.    Each Defendant's Alleged Role

The Indictment alleges as follows as to each Defendant: the True Owner employed three physicians -- Defendants Vaid, Mathieu and Antoine -- to represent falsely to Medicare and Medicaid, among others, that each owned one or more of the Clinics.  In addition to acting as nominal owners, each physician Defendant claimed to have performed medical services that he in fact did not perform, and each signed prescriptions and referrals for medically unnecessary services, medications and supplies.  Defendant Behiry, a physical therapist, and Defendant

---

[2] The parties represent that the True Owner is Aleksandr Burman.  In March 2016, Aleksandr Burman pleaded guilty to a three-count information charging him with conspiracy to commit health care fraud and wire fraud, health care fraud and committing an offense while on release. In May 2017, he was sentenced principally to 10 years of imprisonment.  *See United States v. Burman*, 16 Cr. 190 (S.D.N.Y.).

Zhitnik, an occupational therapist, falsely certified that they performed medical services at the Clinics that they in fact did not perform or that were medically unnecessary.

Defendants Kataev and Tsirlin were business partners of the True Owner and oversaw the operations of some Clinics. They paid cash to the Paid Patients to induce them to receive medically unnecessary or non-existent medical examinations, treatments and supplies at the Clinics and from third-party providers. Kataev and Tsirlin also instructed the Paid Patients that they should be transported to the Clinics by medical ambulettes.

Defendants Miselevich and Voychak owned and operated an ambulette service that transported Paid Patients. They received more than $4 million in reimbursement from Medicaid for these medically unnecessary services. Miselevich and Voychak were also managers of at least one Clinic and paid cash kickbacks to the Paid Patients.

Defendant Marina Burman ("Burman") represented to Medicare, Medicaid and others that she was owner of Universal Supply Depot ("USD"), a company that sold DME, including adult diaper kits. Burman in fact co-owned USD with the True Owner. Between 2010 and around 2013, Medicare and Medicaid paid $3.5 million to USD as reimbursement for DME prescriptions issued by the physician Defendants. Burman knew that many of the reimbursement claims were for DME that was either medically unnecessary or not in fact provided. In many instances, Burman allowed Paid Patients to exchange their DME prescriptions for designer handbags, clothing or houseware. Burman also delivered to the Clinics packages of cash used to pay kickbacks to the Paid Patients.

### C.    The Charges

The initial indictment was returned on November 16, 2016, charging Vaid with five counts. The First Superseding Indictment was returned on January 9, 2017. The operative

3

indictment -- the Second Superseding Indictment -- was returned on February 15, 2017, charging the ten Defendants in six counts.  Counts One through Five charge each Defendant with: (1) conspiracy to commit health care fraud, mail fraud and wire fraud in violation of 18 U.S.C. § 1349; (2) health care fraud in violation of 18 U.S.C. §§ 2, 1347; (3) mail fraud in violation of 18 U.S.C. §§ 2, 1341; (4) wire fraud in violation of 18 U.S.C. §§ 2, 1343 and (5) conspiracy to make false statements relating to health care matters in violation of 18 U.S.C. §§ 371, 1035. Count Six charges five Defendants, Burman, Kataev, Tsirlin, Miselevich and Voychak, with conspiracy to violate the Anti-Kickback Statute in violation of 18 U.S.C. § 371, 42 U.S.C. § 1320a-7b(b)(2)(B).

## II.    DISCUSSION

### A.    Defendant Vaid's Motion to Dismiss

Vaid moves to dismiss the Indictment as to all counts on the basis of the statute of limitations, which is the five-year period provided by 18 U.S.C. § 3282(a).  The initial indictment, which charged Vaid with five counts, was returned on November 16, 2016.  As Vaid concedes, the operative indictment, which is the Second Superseding Indictment, does not allege any additional conduct with respect to Vaid.  Nor did it "materially broaden or substantially amend the charges" against Vaid with respect to the allegations cited below.  *United States v. Rutkoske*, 506 F.3d 170, 175 (2d Cir. 2007).  The Indictment therefore relates back to the initial indictment, *id.*, and the limitations period begins to run after November 16, 2011.  Vaid's motion is denied because the Indictment alleges pertinent conduct occurring after November 16, 2011.

### 1.  Applicable Law

"Commission of a federal crime within the statute-of-limitations period is not an element of the offense."  *United States v. Martinez*, 862 F.3d 223, 235 (2d Cir. 2017) (internal quotation

marks and alterations omitted).  Consequently, "a pre-trial motion to dismiss based on statute of limitations grounds may be premature if the indictment is facially sufficient and the defendant's argument in favor of dismissal requires a determination of factual issues."  *United States v. Levine*, --- F.Supp.3d ----, No. 16 Cr. 715, 2017 WL 1293621, at *3 (S.D.N.Y. Apr. 7, 2017); *see United States v. Alfonso*, 143 F.3d 772, 777 (2d Cir.1998) ("[T]he sufficiency of the evidence is not appropriately addressed on a pretrial motion to dismiss an indictment.").  In deciding the facial sufficiency of an indictment, a court assumes the indictment's factual allegations are true. *United States v. Goldberg*, 756 F.2d 949, 950 (2d Cir. 1985); *accord United States v. Samia*, No. 13 Cr. 521, 2017 WL 980333, at *3 (S.D.N.Y. Mar. 13, 2017).

"[T]he limitations period begins only when the purposes of the conspiracy have been accomplished or abandoned."  *Martinez*, 862 F.3d at 232.  Thus, the statute of limitations for a conspiracy charge may be satisfied if the Government proves the defendant or one of his coconspirators "committed an overt act in furtherance of the conspiracy within the limitations period."  *United States v. Rutigliano*, 790 F.3d 389, 400 (2d Cir. 2015); *accord Rutkoske*, 506 F.3d at 174–75.

### 2.  Application

The Indictment[3] is facially sufficient, and alleges the scheme continued into the relevant limitations period -- i.e., beginning on or after November 16, 2011.  The Indictment charges Defendant Vaid and others with participating in a scheme to defraud Medicare, Medicaid and other insurance providers that continued through "at least in or about 2013."  It further alleges that Defendant and others, "through at least in or about 2013," provided to the Paid Patients

---

[3] All references below are to allegations contained in both the Indictment (the Second Superseding Indictment, which is the currently operative indictment) as well the initial indictment filed November 16, 2016.

5

prescriptions and referrals for medically unnecessary medications, transportation services and DME, such as adult diaper kits.

As to the conspiracy charges, Counts One and Five, the statute of limitations does not warrant dismissal because the Indictment alleges that Vaid or a conspirator knowingly committed an overt act in furtherance of that conspiracy within the limitations period. These alleged overt acts include: (1) an occupational therapist and a radiologist submitting fraudulent claims in 2012 to insurance providers based upon medical referrals Vaid provided; (2) a co-conspirator negotiating a check payable from Medicaid issued to a Clinic in November 21, 2011, for services that Vaid claims to have rendered; and (3) other Defendants paying kickbacks to the Paid Patients in 2012 for receiving medically unnecessary treatment.

Counts Two, Three and Four, which allege the underlying substantive crimes of health care fraud, mail fraud and wire fraud, are timely as charged. These Counts allege that Vaid violated 18 U.S.C. § 2, which provides in part, "Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal." Count Two charges that, at least until 2013, Vaid and others caused Medicare and Medicaid to pay fraudulent health claims for unnecessary and unperformed services purportedly provided by Vaid. Counts Three and Four similarly charge that at least until 2013, Vaid used, or caused others to use, the U.S. mails and interstate wires, respectively, in furtherance of their fraudulent scheme. Because these factual allegations must be accepted as true, the Indictment properly alleges timely conduct attributable to Vaid under 18 U.S.C. § 2. *See, e.g.*, *Rutigliano*, 790 F.3d at 401 (rejecting statute of limitations challenge to mail and wire fraud case where "each of the substantive offenses was based on a mailing or wire within the applicable limitations period"); *United States v. Kerik*, 615 F. Supp. 2d 256, 270 (S.D.N.Y.

2009) (finding that conduct attributable to the defendant under 18 U.S.C. § 2 rendered mail fraud count timely for statute of limitations purposes on motion to dismiss the indictment).

Vaid's arguments to the contrary are unavailing. First, he claims that he was not part of any conspiracy that continued after November 16, 2011, because the Indictment fails to allege that he committed any overt acts after that date. This argument is premature. "Unless a conspirator produces affirmative evidence of withdrawal, his participation in a conspiracy is presumed to continue until the last overt act [in furtherance of the conspiracy] by any of the conspirators." *Martinez*, 862 F.3d at 232–33 (internal quotation marks omitted). "Mere cessation of the conspiratorial activity by the defendant is not sufficient to prove withdrawal." *United States v. Leslie*, 658 F.3d 140, 143 (2d Cir. 2011). The Indictment does not allege that Vaid withdrew by November 16, 2011, or that the conspiracy had been accomplished as of that date. Vaid's assertion that he was no longer a member of the alleged conspiracy during the limitations period must await trial. *Id.* ("[I]t is well-settled that withdrawal from a conspiracy is an affirmative defense for which the defendant bears the burden of proof at trial.").

Second, Vaid cites the Second Circuit's decision in *United States v. Grimm*, 738 F.3d 498, 499 (2d Cir. 2013), arguing that the alleged overt acts are insufficient because they relate merely to the *results* of his previous conduct. Vaid misconstrues *Grimm.* As the Second Circuit recently observed, *Grimm* articulated a "narrow exception" to "the ordinary rule . . . that a conspirator's receipt of anticipated benefits within the limitations period can, by itself, constitute an overt act in furtherance of an ongoing conspiracy." *Rutigliano*, 790 F.3d at 400 (internal citation omitted); *see Grimm*, 738 F.3d at 499. "*Grimm* explained that 'a conspiracy ends notwithstanding the receipt of anticipated profits where the payoff merely consists of a lengthy, indefinite series of ordinary, typically noncriminal, unilateral actions *and* there is no evidence

that any concerted activity posing the special societal dangers of conspiracy is still taking place.'" *Rutigliano*, 790 F.3d at 400 (quoting *Grimm*, 738 F.3d at 502).

In contrast to the conduct at issue in *Grimm*, the Indictment does not charge a "lengthy, indefinite series" of unilateral payments. 738 F.3d at 502. It alleges discrete acts that caused a Clinic, or a third-party provider, to submit fraudulent bills within the limitations period based on referrals Vaid provided; it also charges that a conspirator negotiated a single check Medicaid issued within the limitations period for services Vaid claimed to perform. Vaid's motion to dismiss the Indictment is denied. *See Rutigliano*, 790 F.3d at 400–01 (exception articulated in *Grimm* not justified where the defendant and his coconspirators "engaged, within the limitations period, in measures of concealment and other corrupt intervention" (internal quotation marks omitted)).

## B. Defendant Mathieu's Motion to Sever

Mathieu moves to sever Count Six and the five defendants charged in Count Six from his trial pursuant to Federal Rules of Criminal Procedure 8(b) and 14(a). This count alleges that five other defendants -- Burman, Kataev, Tsirlin, Miselevich and Voychak -- conspired to violate the Anti-Kickback Statute. Antoine, Behiry and Zhitnik join the motion, and Vaid seeks to preserve his right to join in the future. The motion is denied.

### 1. Applicable Law

Federal Rule of Criminal Procedure 8(b) allows joinder of defendants "if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." The "'same series of acts or transactions' language . . . mean[s] that joinder is proper where two or more persons' criminal acts are unified by some substantial identity of facts or participants, or arise out of a common plan or scheme." *United*

*States v. Rittweger*, 524 F.3d 171, 177 (2d Cir. 2008) (Sotomayor, J.) (some internal quotation marks omitted); *accord United States v. Rutigliano*, 614 F. App'x 542, 547 (2d Cir. 2015) (summary order). "[M]embers of two or more conspiracies may be joined as defendants even where the members have not been charged as participating in one overarching conspiracy." *Rittweger*, 524 F.3d at 178. In analyzing joinder under Rule 8(b), courts must "apply a commonsense rule to decide whether, in light of the factual overlap among charges, joint proceedings would produce sufficient efficiencies such that joinder is proper notwithstanding the possibility of prejudice." *Id.* (internal quotation marks omitted).

Federal Rule of Criminal Procedure 14(a) provides in part that "[i]f the joinder of offenses or defendants in an indictment . . . appears to prejudice a defendant . . . , the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires." "[A] district court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States*, 506 U.S. 534, 539 (1993); *accord United States v. Cacace*, 796 F.3d 176, 192 (2d Cir. 2015). "Rule 14 does not require severance even if prejudice is shown; rather, it leaves the tailoring of the relief to be granted, if any, to the district court's sound discretion." *Zafiro*, 506 U.S. at 538–39. "'[L]ess drastic measures [than severance], such as limiting instructions, often will suffice' to cure any risk of prejudice and permit joinder." *United States v. Page*, 657 F.3d 126, 129 (2d Cir. 2011) (quoting *Zafiro*, 506 U.S. at 539).

## 2. Application

Joinder is proper under Rule 8(b). Counts One through Six evince a "common plan or scheme" to fraudulently bill Medicare and Medicaid for misrepresented services. *Rittweger*, 524

F.3d at 177.  The Indictment alleges that Vaid, Mathieu, Antoine, Zhitnik and Behiry, together with others, provided Paid Patients prescriptions or referrals for medically unnecessary medications, transportation services, tests or DME such as adult diaper kits.  The kickbacks are alleged to be integral to the scheme as they induced the Paid Patients' involvement.  Contrary to Mathieu's argument, Count Six, which involves the alleged kickbacks, is not based on a "wholly separate conspiracy."  Rather, the kickback conspiracy was the means to recruit the Paid Patients who were the subject of fraudulent claims.  *See United States v. Turoff*, 853 F.2d 1037, 1044 (2d Cir. 1988) (joinder under Rule 8(b) proper where "one scheme stemmed from the other").

The Indictment also alleges a "substantial identity of facts or participants."  *Rittweger*, 524 F.3d at 177.  Each Defendant is alleged to have played his or her role acting under the direction or employment of the True Owner, who owned the Clinics.  The same underlying conduct, including the payment of kickbacks, is charged in Counts One through Six.

Mathieu asserts that joinder is improper because the Indictment does not allege that Mathieu, Antoine, Vaid, Zhitnik or Behiry knew of the kickback payments.  "Knowledge of the other conspiracy is not required" for joinder, although "it is an indicator of whether or not there is a common scheme or purpose."  *United States v. Ohle*, 678 F. Supp. 2d 215, 225 (S.D.N.Y. 2010).  While the Indictment does not expressly allege that the five Defendants not charged in Count Six knew about the kickbacks used to recruit patients, joinder is proper because the conspiracy in Counts One and Five stemmed from those kickbacks.  *Turoff*, 853 F.2d at 1044.

Mathieu has not shown that severance is warranted under Rule 14(a).  He argues that introducing evidence as to the kickbacks at his trial creates "a substantial risk of prejudice and confusion."  Yet the risk of prejudice or confusion does not necessarily compel severance.  *See Zafiro*, 506 U.S. at 539; *Rittweger*, 524 F.3d at 179 (rejecting the defendant's argument that

severance under Rule 14 was required where "the majority of the evidence introduced at trial was not admissible against [the movant], but rather was relevant only to the other defendants"). At this stage, Mathieu has not shown why the potential for prejudice would not be adequately mitigated by limiting instructions that explain "when evidence could not be considered against a particular defendant" and a jury charge that explains "that the jurors must consider the case against each defendant separately." *Rittweger*, 524 F.3d at 179; *see, e.g.*, *United States v. Mirilishvili*, No. 14 Cr. 810, 2015 WL 5820966, at *15 (S.D.N.Y. Oct. 2, 2015) (holding limiting instructions would offset any potential prejudice from trying a defendant along with her ten codefendants). Nonetheless, the motions are denied without prejudice to Defendants renewing under Rule 14(a) as it becomes clearer which Defendants are proceeding to trial and what evidentiary issues may arise.

### C. Defendants Mathieu's, Antoine's and Zhitnik's Motions to Suppress Post-Arrest Statements

Defendants Mathieu, Antoine and Zhitnik move to suppress their statements made to FBI agents during a post-arrest interrogation. Each interaction, which is recorded on videotape, occurred in the FBI's office on the day of Defendants' respective arrests. These motions are denied.

#### 1. Applicable Law

Under *Miranda v. Arizona*, 384 U.S. 436 (1966), "the prosecution may not use statements made by a suspect under custodial interrogation unless the suspect (1) has been apprised of his Fifth Amendment rights, and (2) knowingly, intelligently, and voluntarily waives those rights." *United States v. Oehne*, 698 F.3d 119, 122 (2d Cir. 2012) (citing *Miranda*, 384 U.S. at 444–45). If a suspect invokes his *Miranda* rights to remain silent or to counsel, "interrogation must stop and the invocation must be 'scrupulously honored.'" *United States v. Gonzalez*, 764 F.3d 159,

165–66 (2d Cir. 2014) (quoting *Michigan v. Mosley*, 423 U.S. 96, 104 (1975)). To invoke his *Miranda* rights, a defendant must make "a clear, unambiguous affirmative action or statement." *Oehne*, 698 F.3d at 123 (internal quotation marks omitted).

"Even absent the accused's invocation of the right to remain silent [or right to counsel], the accused's statement during a custodial interrogation is inadmissible at trial unless the prosecution can establish that the accused in fact knowingly and voluntarily waived *Miranda* rights when making the statement." *Berghuis v. Thompkins*, 560 U.S. 370, 382 (2010) (internal quotation marks and alterations omitted). "'[K]nowing' means with full awareness of the nature of the right being abandoned and the consequences of abandoning it, and 'voluntary' means by deliberate choice free from intimidation, coercion, or deception." *United States v. Taylor*, 745 F.3d 15, 23 (2d Cir. 2014). "The existence of a knowing and voluntary waiver does not, however, guarantee that all subsequent statements were voluntarily made." *Id.* (internal quotation marks omitted). A court must "look at the totality of circumstances surrounding a *Miranda* waiver and any subsequent statements to determine knowledge and voluntariness." *Id.* Relevant factors include "the accused's characteristics, the conditions of interrogation, and the conduct of law enforcement officials." *Id.* at 24 (internal quotation marks omitted).

### 2. Application

#### a. Mathieu

Mathieu's motion to suppress his videotaped statements is denied. As the video starts, Mathieu is handcuffed to a rail in the interrogation room and the interviewing FBI agent, Special Agent Ryan Blatt ("Agent Blatt"), reads aloud to Mathieu the lines of an FBI "Advice of Rights" form. The form addresses the right to remain silent and willingness to answer questions without a lawyer present. The agent and Mathieu then have the following exchange:

AGENT: So yea, if you choose to talk to us, you have to sign this part [of the Advice of Rights form] here. Um, and like I said, if at any point during this interview you decide, "Listen, I don't want to talk any more. I'm not comfortable with this." Just say so. We'll end it right there. Um, but the point of this is just to try and get your half of the story and to tell me about what you did and actually who was, who was running the show.

MATHIEU: Okay.

AGENT: Right?

MATHIEU: Okay. Yeah, I can . . . [Picks up the pen.] I'm not a lawyer. I don't know what … I know that I, uh, I have nothing, I have nothing that I think that I have to to hide, but, uh . . . I know what my wife said, "Don't talk to anyone." So, because, she, she, she . . . But I don't . . . I don't know . . . .

AGENT: Right. But she doesn't really . . . I don't know if she really understands what was happening. Right?

MATHIEU: No, I don't . . .

. . .

MATHIEU: If I don't feel comfortable, then I stop. Whatever . . .

AGENT: At any time, yes. If ever you don't feel comfortable, we can stop the interview at any time. Yup.

MATHIEU: [Signs the Advice of Rights form.]

The Government has proven that Mathieu knowingly and voluntarily waived his *Miranda* rights. The video does not show that Mathieu, a physician, had difficulty with the English language or understanding Agent Blatt's statements. He signed the Advice of Rights form after acknowledging that he could stop answering at any time. *See id.* at 23 ("In general, a suspect who reads, acknowledges, and signs an advice of rights form before making a statement has knowingly and voluntarily waived *Miranda* rights." (internal quotation marks omitted)). The video also does not show that the FBI agents threatened or coerced Mathieu at any time, either before or after he signed the Advice of Rights form.

Mathieu's sole argument is that he invoked his right to remain silent when he said he was "not a lawyer, I don't know" and his "wife said don't talk to anyone." These statements do not constitute a "clear, unambiguous affirmative" invocation of the right to remain silent. *Oehne*, 698 F.3d at 122. His statement as to what his wife said to him, even when considered in conjunction with the surrounding circumstances, is not, as Mathieu asserts, a clear and unambiguous adoption of her suggestion "as his own." Because Mathieu did not invoke his *Miranda* rights and his waiver was knowing and voluntary, his motion to suppress the videotape statements is denied.

### b. Zhitnik

Zhitnik's motion to suppress her videotaped statements is denied. When the video begins, Agent Blatt is referring to the names of some of the Clinics and then says:

> But before we go any further, I don't, I'm sure [the other FBI agent] John explained to you, you have certain rights, right? You have the right to remain silent. You have the right to an attorney. Stuff like that. Um in order for us to have a conversation, which I would really like to, and I hope you would too, um you would have to waive those rights. Okay? So what we'd do is, we'd read you, John would read you these rights. These are your, your rights that you have. And then you would have to sign this form and then waive those rights, in order to continue talking to us. That's how it works.

The other FBI agent then encourages Zhitnik to be honest, and summarizes the Advice of Rights form. He also says, "You are helping us. To some degree though this is an opportunity for you to help yourself as well, okay, because you can look out for yourself." Shortly after, Agent Blatt says, "I should note that this is being recorded as well. The recording will stay with us. We're not going to be showing this to anyone, right? Um, but I should advise you that it is also being recorded."

The other FBI agent reads each line of the FBI Advice of Rights form. Zhitnik nods after each sentence. When the agent hands the form to her, Zhitnik says that she does not have her

reading glasses. The agent reads aloud part of the form that states she has the right to remain silent and the right to an attorney. Zhitnik states she is willing to speak to the agents and signs the form.

The Government has proven that Zhitnik knowingly and voluntarily waived her *Miranda* rights. The video shows that Zhitnik had no difficulty understanding English or what the agents were telling her. She says she understands her rights before she signs the Advice of Rights form.

Zhitnik asserts that her waiver was not voluntary or knowing because she was "seemingly confused about all that was happening to her" and "succumbed to their friendly demeanor and reassurances" after having spent "most of the day with these agents." Her contention is unavailing. First, nothing in the record supports her assertion that she was confused. Second, the agent's statement that speaking with them offered her a chance "to help [her]self" does not evince coercion. *See, e.g.*, *United States v. Ruggles*, 70 F.3d 262, 265 (2d Cir. 1995) ("Certainly, statements to the effect that it would be to a suspect's benefit to cooperate are not improperly coercive."); *United States v. Maccow*, No. 16 Cr. 108, 2016 WL 4368379, at *1 (S.D.N.Y. Aug. 12, 2016) (noting that agent's statement that the defendant could "help [him]self, if [he] want[s] to cooperate" is "plainly insufficient to show coercion"). Third, the agents' friendly demeanor is insufficient to show that Zhitnik's "will was overborne." *United States v. Corbett,* 750 F.3d 245, 253 (2d Cir. 2014) (waiver of *Miranda* rights voluntary where "the evidence suggests that the [defendant] was moved to cooperate, rather than coerced"). Lastly, any uncertainty as to her *Miranda* rights that may have been engendered by Agent Blatt's statement that the FBI would not show the recording to anyone was rectified when the other agent subsequently told her, while reading aloud the Advice of Rights form that Zhitnik then signed: "Anything you say can be used

against you in court." Because Zhitnik's waiver of her *Miranda* rights was knowing and voluntary, her motion to suppress the videotape statements is denied.

### c. Antoine

Antoine's motion to suppress his videotaped statements is denied. The Antoine video, recorded in January 2017, begins with the Agent Blatt saying he is "eager" to talk to Antoine and referring to their "previous conversation" in which Agent Blatt thought Antoine was "holding back." This "previous conversation," according to the Government, refers to an interview that Agent Blatt conducted at Antoine's residence in May 2016. Agent Blatt reads aloud each line of the FBI Advice of Rights form and then then says:

> It's important that you understand those rights. Um, and like I said, in order for us to, to speak now, you would have to sign this and waive those rights. But, also like I said, if you decide to start answering questions, or decide to talk to us, you can stop talking to us at any time. Cool?

Antoine nods in response. Antoine then asks to call his wife. Antoine is provided a phone, and an FBI agent asks that he speak in English. Antoine talks to his wife while the agents have a conversation between themselves. Antoine tells his wife where he is and that he is going to be interviewed. He also tells her that she "ha[s] to" call his attorney to tell the attorney where Antoine is and what is happening to him. At one point, Antoine tells his wife that he is going to be interviewed and says, "the question is now, um, do you think that I, I, I should talk to the agent?" Antoine's wife response is not audible. After Antoine finishes the phone call, the agents give him a bagel and water. Agent Blatt then asks, "So, what do you think?" Antoine replies, "Well, I think I have nothing to hide. I will give it a shot. And then, if there are certain questions that I can't, I will let you, I will just let you know." Antoine reads the Advice of Rights form to himself and then signs it.

The Government has proven that Antoine's wavier of his *Miranda* rights was knowing and voluntary. The video shows the agent reading Antoine the Advice of Rights form aloud and then Antoine reading the form before signing it. Nothing in the video suggest that Antoine, a physician, had any difficulty understanding what was happening or the content of the Advice of Rights form. The video also does not show the FBI agents attempting to threaten or coerce Antoine at any time, either before or after he signed the Advice of Rights form.

Antoine argues that the questioning was improper because he invoked his right to an attorney when he told his wife to contact his attorney immediately. Antoine's statement was not an unambiguous request for counsel. The statement was not directed to the agents but rather to his wife on the phone. He does not state or imply to the agents that he wants his attorney present for questioning. Indeed, the first thing he says to them upon concluding the phone call is, "Well, I think I have nothing to hide. I will give it a shot."

Antoine also argues that Agent Blatt's statement about a "previous conversation" refers to a custodial interrogation conducted that morning by the law enforcement personnel who arrested him. This conversation, according to Antoine, occurred while Antoine was being transported to the FBI office, and before Antoine was advised of his *Miranda* rights. Antoine does not argue, nor does the record suggest, that the agents "conducted an improper two-step interrogation, a technique in which the warnings are given in the middle of an interrogation after procuring an unwarned confession." *United States v. Pena*, 751 F.3d 101, 107 (2d Cir. 2014) (citing *Missouri v. Seibert*, 542 U.S. 600, 611–17 (2004)). Antoine contends that his videotaped statement must be suppressed because it is the "product" of this custodial pre-*Miranda* statements.

This argument is unpersuasive. First, Antoine, who did not file a reply brief, does not offer any evidence or argument to refute the Government's evidence that the "previous conversation" to which Agent Blatt referred occurred in Antoine's home months earlier, rather than on the morning of his arrest. The videotape also undermines Antoine's assertion. After Antoine signs the Advice of Rights form, Special Agent Blatt notes that "a lot of this we already talked about at your residence." Second, Antoine's bare assertion that the videotaped statement was the "product" of any statements, without any elaboration, is insufficient. Even assuming that Antoine was subjected to a custodial interrogation while being transported to the FBI's office, such a "violation does not automatically taint subsequent statements made after he is advised of his rights." *Jones v. Murphy*, 694 F.3d 225, 245 (2d Cir. 2012) (citing *Oregon v. Elstad*, 470 U.S. 298, 318 (1985)). "The relevant inquiry is whether, in fact, the second statement was also voluntarily made." *Id.* (quoting *Elstad*, 470 U.S. at 318). Antoine's videotaped statement -- assuming he was subject to a custodial interrogation earlier that morning -- was voluntarily made as stated above.

Antoine has not shown that an evidentiary hearing is warranted. "[A]n evidentiary hearing on a motion to suppress ordinarily is required if the moving papers are sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that contested issues of fact" exist. *United States v. Getto*, 729 F.3d 221, 226 n.6 (2d Cir. 2013). Antoine's motion, which is not supported by an affidavit from Antoine, does not meet this standard. Antoine does not contest the Government's evidence that the previous conversation to which Agent Blatt referred is the May 2016 interview at Antoine's home. His lawyer's declaration states that "while in the marshal's car, the marshals spoke to Dr. Jones [sic] in ways that were likely to elicit a response" and the "videotaped statement is the product" of this conversation.

These statements are secondhand, insufficiently definite and not specific. Antoine's motion is denied.

### D. Motions of All Defendants for a Bill of Particulars

Each Defendant either moves for a bill of particulars or requests permission to join any such motion. The motions are granted in part and denied in part.

### 1. Applicable Law

Under Federal Rule of Criminal Procedure 7(f), a court "may direct the government to file a bill of particulars." "A bill of particulars enables a defendant to prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy should he be prosecuted a second time for the same offense." *United States v. Ramirez*, 609 F.3d 495, 503 (2d Cir. 2010) (internal quotation marks omitted). A bill of particulars "is required only where the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused." *United States v. Chen*, 378 F.3d 151, 163 (2d Cir. 2004) (internal quotation marks omitted). It "is not a general investigative tool, a discovery device or a means to compel the government to disclose evidence or witnesses to be offered at trial." *United States v. Rivera*, No. 16 Cr. 175, 2017 WL 1843302, at *3 (S.D.N.Y. May 8, 2017); *see also United States v. Bonventre*, 646 F. App'x 73, 79 (2d Cir. 2016) (summary order) (upholding the denial of a motion for a bill of particulars because "such evidentiary detail is not the function of the bill of particulars").

"[A] bill of particulars is not necessary where the government has made sufficient disclosures concerning its evidence and witnesses by other means." *Chen*, 378 F.3d at 163 (internal quotation marks omitted). The production of voluminous discovery, by itself, does not necessarily obviate the need for a bill of particulars. *See United States v. Bortnovsky*, 820 F.2d 572, 575 (2d Cir. 1987) (holding, in insurance fraud case that, "the Government did not fulfill its

obligation merely by providing mountains of documents to defense counsel who were left unguided as to which documents would be proven falsified"); *accord United States v. Ikoli*, No. 16 Cr. 148, 2017 WL 396681, at *5 (S.D.N.Y. Jan. 26, 2017). "Whether to grant a bill of particulars is generally a decision entrusted to the sound discretion of the district court." *Ramirez*, 609 F.3d at 502.

### 2. Relevant Facts

The 41-page Indictment provides a detailed overview of the conspiracy and each Defendant's specific role and conduct. The Government's production has been voluminous. It has produced more than 600,000 pages of Bates-stamped material. The Government describes 19 categories of documents it has produced, including (1) search warrant records; (2) records from Medicare and Medicaid; (3) documents pertaining to investigations, inspections, and on-site visits by Medicare and Medicaid; (4) Clinic documents, including internal financial records; (5) boxes of patient files and financial records from USD and (6) medical necessity forms and summaries of findings. The Government has produced a spreadsheet from Medicaid, which contains 500,000 lines, and twenty large Medicare spreadsheets; each line reflects the patient's name, personal information, the date of purported treatment, the date of reimbursement, the referring or prescribing doctor, the treating doctor or provider and the provider (such as a Clinic, USD, or the ambulette serviced owned by Voychak and Miselevich), among other information.

### 3. Application

Kataev and Tsirlin request that the Government identify which insurance claims were false and fraudulent and whether the fraudulent claim was allegedly based on unnecessary medical treatment or no treatment at all. Mathieu similarly demands for each allegedly fraudulent claim, (1) who prepared and submitted the claim, (2) the portions of each such claim

that were fraudulent and (3) the manner in which the amount for each allegedly fraudulent claim was calculated.

This request is granted in part. In cases involving fraud, courts have required the Government to specify through a bill of particulars which document or transactions it intends to prove are fraudulent if this information is not ascertainable; otherwise, in effect, "the burden of proof impermissibly [may] shift[]" to the defendant to prove the documents or transactions are not fraudulent. *Bortnovsky*, 820 F.2d at 575 (holding that district court erred by failing to grant a bill of particulars to identify the fraudulent documents in insurance fraud case and noting the production of over 4,000 documents did not negate need for bill of particulars because defense counsel was "left unguided as to which documents would be proven falsified"); *see, e.g.*, *United States v. Hawit*, No. 15 Cr. 252, 2017 WL 663542, at *11 (E.D.N.Y. Feb. 17, 2017) (requiring the government to file a bill of particulars specifying the transactions that it "will seek to prove were tainted by an unlawful conspiracy of which [the defendant] was a part"); *United States v. Nachamie*, 91 F. Supp. 2d 565, 574 (S.D.N.Y. 2000) (requiring the Government in Medicare fraud prosecution to identify each and every one of the "false and misleading" claims); *see also United States v. Connolly*, No. 16 Cr. 370, 2017 WL 2537808, at *5 (S.D.N.Y. May 24, 2017) (observing that in light of volume of data produced and the length of the time that lapsed since the alleged conduct occurred "means that it will not do to say, 'The indictment is more fulsome than usual; the underlying data has all been produced, and anyway the defendants know what they said and did'"). Likewise, a bill of particulars is justified here. Giving Defendants data and documents for over 500,000 claims but not specifying which ones it will seek to prove at trial were fraudulent does not enable Defendants to prepare for trial or prevent surprise. *Ramirez*, 609 F.3d at 503.

The Government argues that identifying specific claims is unnecessary because it will show that *all* claims were fraudulent because each was submitted from one of the Clinics that Defendants falsely represented were owned by one of the physician Defendants. This is unconvincing because it ignores the fact that the Indictment alleges that the claims were fraudulent because the Clinics and others submitted reimbursement requests for goods and services that were either medically unnecessary or not in fact provided. Accordingly, as to each individual claim that the Government intends to prove was fraudulent because goods or services were either medically unnecessary or not provided, it must identify, by 60 days prior to trial, the claim and whether the goods or service was not provided or was medically unnecessary. Each such claim shall be identified by provider, service date reimbursement date and the goods or service alleged to have been provided.

The remainders of Defendants' requests are denied because they impermissibly seek evidentiary detail or are an attempt to use the bill of particulars as "a general investigative tool." *Rivera*, 2017 WL 1843302, at *3. Kataev and Tsirlin request the amount of money allegedly paid as kickbacks, the date of each payment and the identity of each "kickback" recipient. Mathieu seeks the identity of who prepared each allegedly fraudulent mailing or wire and the content of those mailing or wire transfers. He also demands that the Government notify Defendants "as to which actors engaged in the crimes charged." Miselevich, Voychak and Zhitnik request the Government to specify "the conduct upon which the Government intends to rely at trial" with respect to them. Given the information the Government has already provided and is required to provide in the future, Defendants have failed to show why their requests are necessary, rather than merely helpful, to the preparation of their defenses. *See United States v. Wey*, No. 15 Cr. 611, 2017 WL 237651, at *19 (S.D.N.Y. Jan. 18, 2017).

Vaid's request for a bill of particulars is also denied. He demands that the Government

provide dates within the limitations period on which Vaid allegedly "acted in furtherance of any

of the crimes charged against him" and how any actions attributable to him were allegedly in

furtherance of the conspiracies or other crimes alleged in the Indictment. This request

impermissibly seeks evidentiary detail. The Indictment, the discovery and the Government's

filing in response to his motion, which includes a proffer of additional evidence it intends to

prove at trial, such as Vaid's communications with the True Owner, apprise Vaid of the acts of

which he is accused such that he can mount an adequate defense at trial.

### E.  Requests for Disclosure of *Brady* and *Giglio* Material

Each Defendant but Vaid either moves for disclosure of materials pursuant to *Brady v.*

*Maryland*, 373 U.S. 83 (1963), and *Giglio v. United States*, 405 U.S. 150 (1972), or requests

permission to join any such motion. The motions are granted in part and denied in part.

### 1.  Applicable Law

"[T]he suppression by the prosecution of evidence favorable to an accused upon request

violates due process where the evidence is material either to guilt or to punishment, irrespective

of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87; a*ccord Turner v.*

*United States*, 137 S. Ct. 1885, 1888 (2017). *Giglio* clarified that *Brady* material includes

"[i]mpeachment evidence." *United States v. Bagley*, 473 U.S. 667, 676 (1985) (citing *Giglio*,

405 U.S. at 154). "Evidence is favorable if it is either exculpatory or impeaching, and it is

material if there is a reasonable probability that, had the evidence been disclosed to the defense,

the result of the proceeding would have been different." *United States v. Rowland*, 826 F.3d

100, 111 (2d Cir. 2016) (internal quotation marks omitted).

"[A]s a general rule, *Brady* and its progeny do not require immediate disclosure of all exculpatory and impeachment material upon request by a defendant." *United States v. Coppa*, 267 F.3d 132, 146 (2d Cir. 2001). "*Brady* material must be disclosed in time for its effective use at trial or at a plea proceeding." *Id.* (internal citations omitted); *see also United States v. Rodriguez*, 496 F.3d 221, 226 (2d Cir. 2007) (noting that *Brady* material must be disclosed "in a manner that gives the defendant a reasonable opportunity either to use the evidence in the trial or to use the information to obtain evidence for use in the trial").

## 2. Application

The Government represents that it understands its discovery obligations, has complied with these obligations and will continue to comply in the future. At a conference on August 30, 2017, the Government reported the parties' agreement that the Government will produce *Giglio* and 18 U.S.C. § 3500 material 21 days before trial. *See United States v. Lobo*, No. 15 Cr. 174, 2017 WL 1102660, at *4 (S.D.N.Y. Mar. 22, 2017) ("'The practice in the Southern District of New York' is that the prosecution produces [§ 3500 material] and *Giglio* 'material a week or two before the start of trial, depending on the complexity of the case.'" (quoting *United States v. Espinal*, 96 F. Supp. 3d 53, 66 (S.D.N.Y. 2015) (Chin, J.)).

Given these representations and the parties' agreement, Defendants' motions are denied except as to the interview notes of the Paid Patients that the Government incorrectly asserts cannot constitute *Brady* material. Specifically, Burman seeks interview notes or other evidence regarding Paid Patients who told the FBI agents that the DME that they were prescribed was in fact provided and medically necessary. Kataev, Tsirlin and Mathieu demand the interview notes of patients of the Clinics who told FBI agents that medically necessary treatments and services were rendered.

The Government argues that any evidence that some patients may have received some necessary medical care does not amount to *Brady* information. It contends that because it does not dispute that *some* medically necessary services and supplies were provided, evidence of bona fide claims is irrelevant to whether other claims were fraudulent. *See, e.g.*, *United States v. Walker*, 191 F.3d 326, 336 (2d Cir. 1999) (affirming exclusion of evidence that defendant prepared some honest asylum applications, reasoning that "[w]hether [defendant] had prepared other, non-fraudulent applications was simply irrelevant to whether the applications charged as false statements were fraudulent"). The Government also argues in opposition to another motion, as noted above, that all of the claims were fraudulent because they were submitted by clinics that were fraudulently organized.

The Government misconstrues the scope of *Brady*. *Brady* encompasses evidence that is material "to guilt *or to punishment*," 373 U.S. at 87 (emphasis added), and must be disclosed in time for effective use at trial or at a plea proceeding, *Coppa*, 267 F.3d at 142. The amount of loss attributable to each Defendant or the conspiracy affects punishment. *See* U.S.S.G. § 2B1.1(b) (offense level in fraud increases increase depending on amount of loss). The notes are discoverable under *Brady* insofar as they undercut the Government's allegations as to the amount of loss by suggesting that the Paid Patients frequently, or always, received medically necessary services or supplies. *See id.* cmt. n.3(E)(i) (noting that loss amount shall be reduced by "the fair market value of . . . the services rendered[] by the defendant or other persons acting jointly with the defendant, to the victim before the offense was detected"). The Government must disclose within 30 days the interview notes reflecting statements by Clinic patients that medically necessary treatments and services were rendered. *See, e.g.*, *United States v. Villa*, 12 Cr. 40,

2014 WL 280400, at *6 (D. Conn. Jan. 24, 2014) (observing that evidence regarding loss amount may affect sentencing and thus constitute *Brady* material).

### F. Disclosure of Rule 404(b) Evidence

Each Defendant except Vaid either moves to compel the Government to disclose evidence of crimes, wrongs or other acts under Federal Rule of Evidence 404(b) or request permission to join such motions. Federal Rule of Evidence 404(b) requires that the Government provide "reasonable notice of the general nature of any such evidence that the prosecutor intends to offer at trial." It does not define "reasonable notice." To the extent any Defendant demands immediate disclosure, the request is denied. "Courts in this Circuit have held that two or three weeks notice is reasonable[, and] a longer period may be appropriate, depending on the circumstances." *Rivera*, 2017 WL 1843302, at *1 (internal quotation marks omitted). Given the scope of alleged the conspiracy and number of Defendants, the Government shall disclose Rule 404(b) evidence at least 30 days before trial. *See, e.g.*, *United States v. Brown*, No. 14 Cr. 509, 2016 WL 4734667, at *3 (S.D.N.Y. Sept. 9, 2016) (requiring disclosure of Rule 404(b) evidence 30 days prior to trial).

## III. CONCLUSION

For the foregoing reasons, Defendants' motions are DENIED in part and GRANTED in part as follows:

(1) Defendant Vaid's Motion to Dismiss the Indictment is DENIED.

(2) Defendant Mathieu's Motion to Sever, joined by Defendants Antoine, Behiry and Zhitnik, is DENIED without prejudice to renew the motion under Rule of Criminal Procedure 14(a).

(3) Defendant Mathieu's, Antoine's and Zhitnik's Motions to Suppress their Videotaped Statements are DENIED.

(4) Defendants' Motions for a Bill of Particulars are GRANTED in part.  For each individual claim that the Government intends to prove was fraudulent because goods or services were either medically unnecessary or not provided, it must identify, by **60 days prior to trial**, the claim and whether the goods or service was not provided or was medically unnecessary.  Each such claim shall be identified by provider, service date reimbursement date and the goods or service alleged to have been provided.  The motions are DENIED in all other respects.

(5) The Motions for Production of *Brady* and *Giglio* Material brought or joined by Mathieu, Antoine, Kataev, Tsirlin, Burman, Behiry, Zhitnik, Miselevich and Voychak are GRANTED in part.  **Within 30 days**, the Government shall produce interview notes reflecting statements by Clinic patients that medically necessary treatments and services were rendered.  The motions are DENIED in all other respects.

(6) The motions for early disclosure of Rule 404(b) evidence filed or joined by Defendants Mathieu, Antoine, Kataev, Tsirlin, Burman, Behiry, Zhitnik, Miselevich and Voychak are GRANTED to the extent they seek disclosure no later than 30-days before trial and DENIED to the extent they seek a disclosure prior to that date.

The Clerk of Court is respectfully directed to close the motions at Docket Numbers 133, 139, 140, 142, 144, 145 and 148.

Dated:  September 5, 2017
        New York, New York

LORNA G. SCHOFIELD
UNITED STATES DISTRICT JUDGE